377 So.2d 780 (1979)
Joyce Bernice HAWTHORNE, Appellant,
v.
STATE of Florida, Appellee.
No. II-28.
District Court of Appeal of Florida, First District.
December 7, 1979.
*781 Leo A. Thomas of Levin, Warfield, Middlebrooks, Mabie, Rosenbloum & Magie, Pensacola, for appellant.
Jim Smith, Atty. Gen. and Raymond L. Marky, Asst. Atty. Gen., for appellee.
BOOTH, Judge.
This cause is before us on appeal from a judgment of conviction of murder in the first degree and sentence to life imprisonment. Appellant raises some 17 issues on appeal. Our determination as to four of those issues renders consideration of the other issues unnecessary. The following errors below require reversal of the conviction and remand for a new trial:
I. Illegally obtained confessions and incriminating statements were improperly admitted into evidence.
II. Testimony of witnesses for the State whose names were not disclosed to the defense until the day of the trial were improperly admitted without a factual inquiry by the court as required by Richardson v. State, 246 So.2d 771 (Fla. 1971).
III. Certain rebuttal witnesses for the State were improperly allowed to testify as to the reputation of the deceased.
IV. Testimony as to the deceased's prior threats and acts of violence toward the defendant, her children and third persons was improperly disallowed.
The deceased, Aubrey Hawthorne, was defendant's husband. He was shot to death during the early morning hours of January 28, 1977, in the Hawthorne home by bullets fired from a number of weapons belonging to the deceased. The police were called, and private counsel contacted on behalf of defendant.
Defendant was arrested at 4 a.m. immediately following the shooting, advised of her rights and taken to jail. Defendant's children, the youngest age six, were also transported to the jail for interrogation. The record reveals that defendant, a 36-year old mother of five minor children, had married at age 18; not worked outside the home and had no prior experience with law enforcement personnel or procedures. The record establishes that at the time of her arrest and throughout the 12 hours of incarceration prior to her recorded confession, she was suffering from mental and physical distress, anguish and exhaustion.
Private counsel had been retained and advised defendant to make no statements. At 11:30 a.m. on the day of her arrest, defendant was transported from jail to a bond hearing, but bond was denied due to lack of background information concerning the defendant.[1] Defendant was, in the words of Officer Dunn of the Escambia County Sheriff's Department, "noticeably shaken." Defendant was represented at the bond hearing by counsel. After the hearing, Officer Dunn asked if he could drive defendant back to the jail. Defendant's lawyer testified that he said to Dunn: "Okay, but no statement," and that Officer Dunn agreed. Officer Dunn testified he remembered asking to drive defendant back; knew defendant had been told to make no statements; but could "not recall" whether defendant's attorney had told him "no statement" or not. Dunn testified that there "could have been" an agreement not to question defendant, but he did "not recall."
On the trip back to jail from the bond hearing, Officer Dunn testified that he discussed with defendant the advantages of giving a statement; that defendant told Dunn her attorney had advised her not to make a statement; that she expressed concern about her children and Dunn replied that her children were being held at the Sheriff's Department and being questioned by investigators. Further, Dunn testified he told defendant that it was "hard on the children" and that "they weren't taking it real well;" it was "tearing them up" and that "it was necessary to question the children" because they were the best source of *782 information and that defendant's giving of a statement would save the children from further questioning.[2] Again, the defendant stated that her attorney had advised her not to make a statement.
Defendant was returned to jail during the lunch hour, but she was so upset that she was unable to eat. She had not slept the previous night because she and two of the children were ill and her husband had threatened both her and the children. She was, in the words of Officer Dunn, "noticeably shaken," "upset," "depressed and tired."
After the noon hour, Officer Dunn took defendant to his office for interrogation. Concerning his advising her of her Miranda Rights at that time, he testified:
"Q You indicated that the first time you gave her her rights, she didn't fully comprehend or understand them; did I understand you correctly?
A I can't ... I advised her that afternoon. As I say, she was shaken and at that point in time we did not get into the criminal act. I cannot swear that Mrs. Hawthorne totally understood what her rights were at that point."
Dunn further testified that defendant "was upset at that time and she needed someone, anybody to sit down and talk with her." Dunn also testified, however, that prior to *783 the commencement of this 2:00 interview he had contacted prosecuting attorneys Ron Johnson and Chuck Williams, told them that defendant was not making a statement on advice of counsel and been told by prosecuting attorney Williams to get a statement. Dunn specifically testified:
"Mr. Williams instructed me at that time and said if it was possible to go ahead and get a statement."
Admittedly, these law enforcement officials all knew that defendant was claiming fundamental rights, yet they continued in their efforts to obtain a waiver of counsel and incriminating statements from her.[3]
Beginning at 2:00 p.m. on the same day as her arrest, Officer Dunn interviewed the defendant for 2 1/2 hours. This interview was unrecorded. During that time Dunn admits defendant repeatedly told him that her attorney had advised her to make no statements. She also stated that she did not understand why her attorney had given her that advice since she had nothing to hide. Officer Dunn testified he told Mrs. Hawthorne:
"If she was not going to deny the events of that evening that a statement could not hurt her and it might possibly help even in getting into the background of the family itself and into the true reason that the death came about ..."
The defendant testified that Officer Dunn told her she did not have to listen to her attorney and could make her own decisions since she, after all, would have to pay her attorney who was from the private sector. She testified Dunn told her a public defender could be provided to her if she wished to dismiss her private attorney. Defendant's testimony was, in part, as follows:
"He said all attorneys told their clients not to talk, it was just an ordinary thing, but it would be best for me to make a statement. He said it would help me... . And he said if you can make this statement, I couldn't promise you, but I'm sure I can get you out on bond tonight and you will not have to spend the night in jail. He said he couldn't promise me, but kept assuring me he could and that I didn't need to be upstairs with the lesbians, et cetera and it was sort of frightening because at this time they had not put me in the cell... . I wanted to wait and he said it was getting close to five o'clock and he couldn't go talk to the State Attorney if I didn't hurry and make a statement..."
At 4:30 in the afternoon, after having not eaten for 24 hours, nor slept for 36 hours, and having been "interviewed" for 2 1/2 hours, the defendant signed a waiver of counsel and agreed to make a statement. At that point the tape recording machines were turned on. The transcript of that statement reveals that on a number of occasions the defendant was too tired to go on or too upset to continue talking. At one point, Officer Dunn stated for the record that the tape had been turned off so that the defendant could "regain her composure." Finally, at about 7:00 that night, the tape machines were turned off and the defendant was sent back to the jail cell with a pad and pen to continue making notes on her relationship with her husband and the circumstances surrounding his death.
Defendant's concern for her children is apparent throughout the recorded statement. Officer Dunn knew it meant a great deal to her to get out of jail and be allowed to take care of her children. In fact, he represented to the defendant that he would do everything in his power to secure bond for her release. Dunn testified at trial that he did not "guarantee" or "promise" her a bond in exchange for a statement. However, Dunn's testimony in his deposition of record was as follows:
"I told her that I would do everything, I promised her ... I didn't promise her anything. I told her that I had contacted the State Attorney's office and *784 that Mr. Williams was receptive to a bond and I was in hopes that we would be able to get a bond set . .."
The foregoing and other testimony of Dunn establish repeated assurances to defendant that he would assist in obtaining a bond.
A confession, to be admissible, must not be extracted by any sort of threat or violence, nor be obtained by any direct or implied promise, however slight, or by the exertion of any improper influence. This basic rule of law is stated in Bran v. United States, 168 U.S. 532, 542-543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897):
"`But a confession, in order to be admissible must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner had been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.'"
The foregoing is a statement of the law in this State: Frazier v. State, 107 So.2d 16 (Fla. 1958); Harrison v. State, 152 Fla. 86, 12 So.2d 307 (Fla. 1943); MDB v. State, 311 So.2d 399, 400 (Fla. 4th DCA 1975).
In Fillinger v. State, 349 So.2d 714 (Fla. 2nd DCA 1977), the officer who questioned the defendant and elicited her confession testified that he told the defendant he would advise the state attorney of her cooperation and that he would take her cooperation into consideration in seeking to establish the amount of bond. The trial court reversed the conviction, held that the confession was induced by promises of leniency and the State had failed to carry its burden of proof that the confession was freely and voluntarily made.
In Ware v. State, 307 So.2d 255 (Fla. 4th DCA 1975), the court set aside a conviction of murder and robbery because the State failed to establish that defendant's confession was voluntary. The defendant in that case had been subjected to the so-called "Family Approach," in that he was told by officers that if he gave a statement he would be able to return to his family sooner, the idea being, as explained by the officer, "[t]o get a person to weaken so you will be able to talk to him a little better." In Ware, as here, the defendant was advised of his rights and signed a waiver.
In the instant case, Officer Dunn admittedly appealed to defendant's concern for her children and gave assurances of help in securing a bond so she could be with them. Dunn went further. He told the defendant that the children were being interrogated, that it was hard on them and that her giving of a statement would eliminate the need for further questioning of the children. The totality of these promises and threats far exceed the totality of the circumstances appearing in any recent decision holding a confession invalid.
The State also contends that appellant waived her right to counsel. The test to be applied in determining waiver is stated by the United States Supreme Court in Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977), wherein the court summarizes the holdings of its prior decisions as follows:
"[I]t was incumbent upon the State to prove `an intentional relinquishment or abandonment of a known right or privilege' ... [The] standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant . . and that courts indulge in every reasonable presumption against waiver ... This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. [Cites omitted]."
The facts in the Brewer case are analogous to those here in that defendant Williams had obtained counsel, been advised by his counsel to make no statements, and the law enforcement officials who took him into custody were aware of the fact that he had *785 retained counsel. After being taken into custody Williams was transported by officers to another city. During the automobile trip, defendant Williams referred to his counsel and stated he would tell them all about it after he saw his attorney. During the automobile trip the detective used the so-called "Christian Burial Speech" to convince the defendant, known to be religious, to reveal the location of the victim's body to allow proper burial. The State trial court found that under these circumstances incriminating statements made during the trip were admissible into evidence because defendant voluntarily waived his right to counsel. A lower federal court on petition for habeas corpus, granted a new trial.
The United States Supreme Court in Brewer v. Williams, affirmed, noting that the "Christian Burial Speech" was in fact an interrogation made during Williams' "isolation" from his counsel and holding (430 U.S. at 404-405, 97 S.Ct. at 1242-1243):
"[J]udged by these standards, [for proof of waiver of right to counsel] the record in this case falls far short of sustaining petitioner's burden. It is true that Williams had been informed of and appeared to understand his right to counsel. But waiver requires not merely comprehension, but relinquishment, and Williams' consistent reliance upon the advice of counsel in dealing with authorities refutes any suggestion that he waived that right... . His statements while in the car that he would tell the whole story after seeing McKnight [attorney] . . were the clearest expressions by Williams himself that he desired the presence of an attorney before any interrogation took place. But even before making these statements Williams had effectively asserted his right to counsel by having secured attorneys at both ends of the automobile trip, both of whom, acting as his agents, had made clear to the police that no interrogation was to occur during the journey. Williams knew of that agreement and, particularly in view of his consistent reliance on counsel, there is no basis for concluding that he disavowed it... ."
The United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) stated that a defendant may waive his right to remain silent and to be assisted by counsel during custodial police interrogation, but held (384 U.S. at 444-445, 86 S.Ct. at 1612):
"If, ... he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."
In State v. Prosser, 235 So.2d 740 (Fla. 1st DCA 1970), this Court applied the Miranda Rule to hold that where an accused, when asked if he wanted a lawyer made statements such as: "Well, I probably need one," right to counsel was claimed, and the confession thereafter obtained without counsel was inadmissible.
The United States Supreme Court in Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1933) held that the period between arraignment and trial is "perhaps the most critical in a criminal proceeding." This case proves the correctness of that holding and demonstrates the need for adherence to constitutional safeguards such as the right to effective assistance of counsel. It is imperative that the fundamental rights of an individual charged with violation of the law be observed and protected by law enforcement officials and by the courts. On retrial of defendant, her statements and confessions, or any evidence relating thereto, are inadmissible.
Other issues on appeal to be addressed involve testimony as to the reputation in the community of the deceased for *786 violence, and prior threats and acts of violence by the deceased, evidence pertinent to the issue of self defense. On the day of trial, after discovery was complete, including the exchange of witness lists, the State filed a Second Amended Answer to Demand for Discovery, listing nine additional witnesses. Defense counsel objected and requested a continuance or time to depose the witnesses. The trial court denied this request and permitted the State to introduce the testimony of four of the witnesses listed. The trial court failed to conduct the inquiry required by Richardson v. State, supra, to determine the circumstances surrounding the State's breach of the discovery rules and whether the defendant was prejudiced by the State's noncompliance with the rules. Failure to conduct this inquiry requires a new trial. Smith v. State, 372 So.2d 86 (Fla. 1979); Henderson v. State, 372 So.2d 217 (Fla. 1st DCA 1979).
The trial court also erred in allowing the testimony of the four witnesses newly revealed by the State because no proper predicate was laid for their testimony. These witnesses were not residents of the same community as the deceased but were allowed to testify to the reputation of the deceased based on having seen him at the Monsanto Plant where the deceased and the witnesses worked, or at a service station or barber shop where deceased periodically traded.
The rule is stated in Nelson v. State, 32 Fla. 244, 13 So. 361, 362 (1893), as follows:
"When character for peacefulness or turbulence is put in issue in such cases, the general rule is that the proof thereof must be made by evidence of the general reputation of the party in the community for such character, and not by evidence of specific acts or conduct on particular occasions."
In Stanley v. State, 93 Fla. 372, 112 So. 73 (1927), the Florida Supreme Court held improper a question propounded a witness as to whether he knew the "`general reputation of defendant as to peacefulness'," because the question was not limited to the witness' knowledge of defendant's reputation among neighbors in the community where he resides, holding (112 So. at 74):
"It is a cardinal rule of evidence that to prove any fact the best evidence of such fact should be adduced. A man is best known by his neighbors or people in the community in which he resides. It is their opinion, formed and expressed, based upon their knowledge of him, which establishes his general reputation. The question propounded to the witness did not restrict any knowledge the witness may have had concerning the general reputation of the defendant to any certain class of persons or to any particular place. The proper mode of examining into the general reputation is to inquire of the witness whether he knows the general reputation of the person in question among his neighbors or in the community in which he resides for peace and quiet, or for truth and veracity, or other trait of character that may be relevant. If the witness testifies he knows such reputation, then he may be asked to state what that reputation is, whether it is good or bad... ."
The State did not prove that testimony from the community where the deceased resided was unavailable and therefore the testimony of these four witnesses was improperly admitted under Hamilton v. State, 129 Fla. 219, 176 So. 89 (1937) and Florida East Coast Railway Co. v. Hunt, 322 So.2d 68 (Fla. 3d DCA 1975), cert. denied 336 So.2d 600 (Fla. 1976). The Florida East Coast Railway v. Hunt court held (322 So.2d at 69):
"In considering the law as to reputation witnesses, we initially point out that we fully concur and agree that Hamilton does state an exception to the general rule, where the proper circumstances exist. In that case, there was a showing of an unavailability of reputation witnesses from the community or neighborhood where the defendant lived and a further showing that the defendant was well known among the people with whom she worked. Upon appeal by the defendant, the Supreme Court held that the trial *787 court should have allowed in as reputation witnesses the co-employees of the defendant. In the present case, however, there is no similar showing of an unavailability of reputation witnesses from the community or neighborhood where Patterson resided."
Here the evidence was improper under either the general rule or the exception thereto.
The final issue concerns defendant's efforts to elicit testimony as to the deceased's threats and acts of violence toward the defendant, her children and third persons. This evidence was improperly disallowed by the trial court. Fear and apprehension in the mind of the defendant, and the reasonableness of that fear and apprehension, were questions for the jury to determine as bearing on the defendant's claim of self defense.
The Florida Supreme Court, in the landmark case of Garner v. State, 28 Fla. 113, 9 So. 835, 840 (1891) states the rule of admissibility of evidence of prior threats by the deceased against the defendant, as follows:
"The question of the admissibility of threats is one for the court's decision. If there is the slightest evidence tending to prove a hostile demonstration, which may be reasonably regarded as placing the accused apparently in imminent danger of losing his life or sustaining great bodily harm, the threat should not be excluded... . They are admissible because they serve to explain the demonstration or overt act which is the predicate for their introduction, and to show the reasonableness of the accused in believing himself in that danger which justifies the taking of human life. It is, however, not to be forgotten that the weight of such threats, considered in connection with the alleged overt act, is, as is the credibility of the witnesses testifying to either such act or threats, a question for the jury... . The admission by the court of either the one or the other implies nothing as to its truthfulness or weight. The Court discharges its delicate functions in admitting or excluding the threats, and it should admit them, even where its mind is in a state of doubt whether or not the alleged demonstration, considered in connection with such threats, would be sufficient to cause a man of ordinary prudence to reasonably believe himself to be in danger of life or great bodily harm; for all such doubts are to be solved in favor of the accused...."
In the instant case, the trial court, by improperly limiting the testimony of witnesses as to prior threats and acts of violence, severely hampered the jury's ability to evaluate the circumstances surrounding the shooting.
Accordingly, the judgment and sentence below are REVERSED and set aside, and this cause is REMANDED for a new trial in accordance herewith.
MILLS, C.J., and BAILEY, W.L., Associate Judge, concur.
NOTES
[1] At the bond hearing there was discussion as to whether defendant should be taken to the hospital.
[2] Record pp. 68-71: (Testimony of Officer Dunn)

"Q On the way back to the jail, did you tell Mrs. Hawthorne that they were questioning her children at the jail?
A Yes, I did.
Q Did you tell her that it was hard for the children to talk about what happened?
A Yes, I did.
Q Did you tell her that, `Your children have been there most of the day,' and they were still questioning them?
A Yes. We discussed Mrs. Hawthorne's children. She was very much concerned about their well-being and who was taking care of the children and their whereabouts at that time. Unfortunately, no one had extended Mrs. Hawthorne the courtesy of explaining where her children were or what they were exposed to or anything of this nature.
Q Did you tell her that this questioning was tearing up the children, to talk about the problems between father and mother?
A She asked how the children were taking the questioning and I told her that they weren't taking it real well; that it was necessary to question the children, that our only concern in this case was to determine what actually happened in her home and we had to go to the best source available and at this point, the best source was her children.
Q Did you say that they would probably have to bring the children into Court at some point in time to put them on the stand and ask them questions?
A Yes, I did.
Q Did you tell Mrs. Hawthorne that you could save the children from this by simply making a statement?
A I told Mrs. Hawthorne that she knew more about the case than anybody else. A statement from her would be the best source of information that we could have, and that this would probably make it easier in the long run, referring to interrogation or questioning the children and detaining them at the office and trying to determine the problems that exist between the parents and the events leading up to and the shooting itself and the events immediately following the shooting.
Q From your answer, am I correct that you either told her or implied that by her giving a statement, it could save the children some of the problems that they were going through; would that be correct?
* * * * * *
A She was concerned about the children having to remain at the Sheriff's Department, having to make these statements. It was quite obvious to me in talking with Mrs. Hawthorne that her concern was for the children and it was not effort on her part to hide anything or to cover up anything that may have occurred in their home.
* * * * * *
Transcript pp. 500-501:
Q Did you tell her that the questioning was tearing up the children to talk about the problems between their parents?
A When she inquired I did, yes.
Q Did you say that they would probably have to bring the children into court at some point in time and put them on the stand and ask them some questions?
A In reply to a question of Mrs. Hawthorne, I did, yes.
Q Did you tell Mrs. Hawthorne that you could save the children from this by simply making a statement?
A I told Mrs. Hawthorne that we wanted the information from the best source we could get it from, which was Mrs. Hawthorne. Not having the information from her, we had to go to a secondary source.
Q And by secondary, I assume you meant the children?
A The children, yes ..."
[3] Appellee states that if the state attorneys in this case, by contacting Mrs. Hawthorne without the presence or consent of her counsel, violated the Code of Ethics, it would form the basis for a grievance complaint, but not suppression of the confession.