408 So.2d 801 (1982)
Joyce Bernice HAWTHORNE, Appellant,
v.
STATE of Florida, Appellee.
No. VV-307.
District Court of Appeal of Florida, First District.
January 18, 1982.
*802 Leo A. Thomas of Levin, Warfield, Middlebrooks, Mabie & Magie, Pensacola, for appellant.
Jim Smith, Atty. Gen., and Raymond L. Marky, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This is an appeal from a conviction of second degree murder. Finding merit in several points on appeal, we reverse and remand for a new trial.
This was appellant's second trial for the murder of her husband. Her first conviction, for first degree murder, was reversed by this court in Hawthorne v. State, 377 So.2d 780 (Fla. 1st DCA 1979). The opinion in that case contains an adequate presentation of the facts surrounding the shooting of appellant's husband, Aubrey Hawthorne, and those facts will not be reiterated here.
One of the points raised in this appeal is that the prosecution should not have been permitted to impeach Mrs. Hawthorne's testimony at this second trial using *803 her testimony from the first trial because her first trial testimony was arguably the product of an illegally obtained statement which was improperly introduced at the first trial. Appellant contends that the decision in Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), is directly applicable in this case and that the State failed to demonstrate that the statement procured through its illegal action did not induce her first trial testimony which was used for impeachment at the second trial. Defense counsel objected and moved for a mistrial when the alleged improper impeachment occurred. The State contends that the principle of Harrison v. United States, supra, prohibiting impeachment with prior testimony which is a product of an illegally obtained confession, has been eroded by subsequent decisions in a series of cases beginning with Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).[1] Alternatively, the State argues that Harrison v. United States, supra, does not apply to the instant situation, and that the appellant would have testified at the first trial in support of her claim of self-defense regardless of the introduction of the illegally obtained statement.
We agree with appellant that Harrison v. United States is applicable in the instant situation and that the State failed to respond to its burden of showing that its illegal action did not induce the testimony at the first trial which was used to impeach at the second trial. Therefore, the first trial testimony was inadmissible for impeachment purposes. We accordingly reverse on this point.
As to the argument that the principle of Harrison v. United States has been overruled by Harris v. New York and subsequent cases, we disagree. The ruling in Harris v. New York permits the use of a confession obtained without warning the defendant of his right to counsel to impeach the defendant's credibility, even though such a confession could not be used in the prosecution's case-in-chief. Significantly, the court in Harris pointed out that the "[p]etitioner makes no claim that the statements made to the police were coerced or involuntary"[2] and that even though the evidence was not admissible in the prosecution's case-in-chief, it would not necessarily follow that the evidence should be "barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." 401 U.S. at 224, 91 S.Ct. at 645. The Florida Supreme Court noted in Nowlin v. State, 346 So.2d 1020 (Fla. 1977), in commenting on Harris, that in order for the trustworthiness of a statement used for impeachment to satisfy legal standards, the statement must at least be shown to have been voluntarily given, the State having the burden to show voluntariness. The premise for the decision in Harris, the reliability of the statements used to impeach, would not necessarily be satisfied in every case which presents a situation similar to that of Harrison. Accord, Ibn-Tamas v. United States, 407 A.2d 626, 641-642 (D.C.App. 1979). In the instant case, the rationale for Harris, that testimony which is unquestionably reliable ought not to be barred for all purposes, is without a doubt not applicable. The precise reason why Mrs. Hawthorne's statement was determined by this court to have been improperly admitted at the first trial was its coerced and involuntary nature. 377 So.2d at 784. Therefore, in our opinion, as to the instant situation the Harrison decision remains viable.
The State argues that Harrison and the instant case are distinguishable and that appellant would have taken the stand at the first trial in order to establish self-defense even if the illegally obtained statement had not been admitted. As to these contentions, we note that a similar possibility was addressed in Harrison:

*804 But even if the petitioner would have decided to testify whether or not his confessions had been used, it does not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal shot was fired. On the contrary, the more natural inference is that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury. That is an inference the Government has not dispelled. 392 U.S. at 225-226, 88 S.Ct. at 2011-2012.
Similarly, in the instant case even if appellant might have taken the stand at the first trial regardless of the admission of the statement, it does not follow that she would have admitted placing a shotgun under her daughter's bed on the night of the shooting, for example.[3] We conclude that the State failed to show that the prior testimony used for impeachment purposes and complained of here was not the product of the illegally obtained and unreliable statement. In addition, these references at the second trial to the contents of the illegally obtained statement ignored this court's admonition in the first Hawthorne opinion that "[o]n retrial of defendant, her statements and confessions, or any evidence relating thereto, are inadmissible." 377 So.2d at 785.
We think the trial court also erred in refusing to allow a proffer of testimony by a witness, appellant's daughter America Hawthorne, as to alleged sexual misconduct by the deceased towards her. There was some confusion as to precisely when the proffer would be made,[4] however, the trial court clearly indicated that the proffer would not be allowed. "A trial court should not refuse to allow a proffer of testimony. This is necessary to insure full appellate review." Piccirrillo v. State, 329 So.2d 46 (Fla. 1st DCA 1976). Appellee contends that in order for the episode regarding which America would have testified to have been relevant to the defense of self-defense, it had to be shown that appellant was aware of the occurrence. Not having a proffer of the testimony to review, we cannot determine whether it would have been relevant. Reversal on this point is therefore in order, particularly since this court previously ruled that the trial court had improperly limited witnesses' testimony as to the deceased's acts of violence toward appellant, her children, and third persons. 377 So.2d at 787.
The trial court also erred in allowing the prosecution to attempt to impeach America Hawthorne's credibility by playing her entire tape recorded statement that had been taken previously. The stated purpose for playing the tape was to contradict America's assertion that before the tape recorded statement was taken she had spoken with the state attorney off the record and mentioned that her father had threatened to "make the rounds" on the night of his death; the prosecutor implied that this aspect of America's testimony had been *805 fabricated just before trial. The prosecutor also mentioned that the tape would serve to impeach America as to her ability to recollect and her demeanor on prior occasions when her statements were taken. First of all, the tape recorded statement could not prove or disprove what had been said off-the-record before the conversation was recorded. Secondly, with regard to America's recollection of events, the prosecutor had already engaged in a lengthy impeachment of her on the basis of prior inconsistent statements contained in her depositions. Finally, with regard to America's demeanor, the prosecutor had previously presented evidence to support his suggestion that the face she was presenting to the jury was not sincere because she had never wept on other occasions while discussing the case. Two previously unannounced witnesses were presented and testified at length about her demeanor on the occasions when her statements were taken. Thus, the playing of the entire tape recorded statement in the presence of the jury constituted improper impeachment. Cf. Hill v. State, 355 So.2d 116 (Fla. 4th DCA 1978).
The last argument by appellant that warrants discussion is that the trial court erred in disallowing the testimony of Dr. Lenore Walker, a clinical psychologist who would have testified as an expert with regard to the battered woman syndrome. The purpose of such testimony would have been to give the jury a basis for considering whether appellant suffered from the battered-woman syndrome, not in order to establish a novel defense, but as it related to her claim of self-defense. We are aware of the conflicting decisions of various jurisdictions as to the admissibility of this type of expert testimony. See, e.g., Smith v. State, 247 Ga. 612, 277 S.E.2d 678 (1981); State v. Thomas, 66 Ohio St.2d 518, 423 N.E.2d 137 (1981); Buhrle v. State, 627 P.2d 1378, 1378 (Wyo. 1981); Ibn-Tamas v. United States, 407 A.2d 626 (D.C.App. 1979). The courts that have considered the admissibility of this type of expert testimony have generally analyzed it to see whether it meets three basic criteria: (1) the expert is qualified to give an opinion on the subject matter; (2) the state of the art or scientific knowledge permits a reasonable opinion to be given by the expert; and (3) the subject matter of the expert opinion is so related to some science, profession, business, or occupation as to be beyond the understanding of the average layman, citing Dyas v. United States, 376 A.2d 827 (D.C.App. 1977), cert. denied 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). Basically, the same criteria are applicable in the instant case. See, Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1980); Buchman v. Seaboard Coastline Railroad Co., 381 So.2d 229 (Fla. 1980); Johnson v. State, 314 So.2d 248 (Fla. 1st DCA 1975).
The few case authorities which have considered the admissibility of this type of expert testimony disagree primarily with regard to (1) whether the study of the battered-woman syndrome is an area sufficiently developed to permit an expert to assert a reasonable opinion, and (2) whether the battered-woman syndrome is beyond the knowledge and experience of most laymen.
In Ibn-Tamas and Smith, the courts concluded that the expert testimony should have been allowed, inasmuch as the subject matter was "beyond the ken of the average layman." 277 S.E.2d at 683. "[T]he expert's testimony explaining why a person suffering from battered woman's syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself, would be such conclusions that jurors could not ordinarily draw for themselves." Id. The court in Ibn-Tamas also concluded that the expert could provide "an interpretation of the facts which differed from the ordinary lay perception," therefore the subject matter was "`beyond the ken of the average layman.'" 407 A.2d at 635. The Ibn-Tamas court determined, however, that the trial court had not ruled on whether the expert, Dr. Lenore Walker, was sufficiently qualified to give an opinion or whether "`the state of the pertinent art or scientific knowledge'" would permit an expert opinion. 407 A.2d at 635. The court said that this third criterion depended on "whether *806 Dr. Walker's methodology for identifying and studying battered women" was generally accepted. 407 A.2d at 638. The question whether the second and third criteria were satisfied was remanded to the trial court.[5]
In State v. Thomas, the Ohio Supreme Court determined that expert testimony by a psychiatric social worker was properly excluded because the battered-woman syndrome was within the jury's understanding and also that the syndrome "is not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant testimony under the guise of expertise." 423 N.E.2d at 140.
In Buhrle v. State, the Wyoming Supreme Court in rejecting Dr. Walker's testimony on the syndrome said that "we are not saying that this type of expert testimony is not admissible; we are merely holding that the state of the art was not adequately demonstrated to the court, and because of inadequate foundation the proposed opinions would not aid the jury." 627 P.2d at 1378.
We agree with the view expressed by the Georgia Supreme Court in Smith v. State insofar as it concluded that jurors would not ordinarily understand "why a person suffering from battered-woman's syndrome would not leave her mate, would not inform police or friends, and would fear increased aggression against herself... ." 277 S.E.2d at 683. In the instant case, however, there has been no determination below as to the adequacy of Dr. Walker's qualifications or the extent to which her methodology is generally accepted indicating that the subject matter can support a reasonable expert opinion. Our determination that this expert testimony would provide the jury with an interpretation of the facts not ordinarily available to them is subject to the trial court determining that Dr. Walker is qualified and that the subject is sufficiently developed and can support an expert opinion.
Appellee argues that to admit this type of expert testimony would violate the rule stated in Tremain v. State, 336 So.2d 705 (Fla. 4th DCA 1976), and recently followed by the Florida Supreme Court in Zeigler v. State, 402 So.2d 365 (Fla. 1981), that "testimony regarding the mental state of a defendant in a criminal case is inadmissible in the absence of a plea of not guilty by reason of insanity," 402 So.2d at 373, and the rule that the doctrine of diminished capacity is not available in Florida. State ex rel Boyd v. Green, 355 So.2d 789, 794 (Fla. 1978). Zeigler and other cases following the rule stated in Tremain[6] were cases in which the accused sought to assert as part of the defense a diminished capacity which did not rise to the level of insanity. In Tremain, in support of the defense of entrapment, the defense proffered the testimony of a psychologist to the effect "that defendant was dependent on others and lacked willpower." 336 So.2d at 706. In Zeigler, the defense sought to offer the testimony of a psychiatrist although the purpose for offering that expert testimony is not clear in the opinion. We think there is a difference between offering expert testimony as to the mental state of an accused in order to directly "explain and justify criminal conduct," Tremain at 706, and the purpose for which the expert testimony was offered in the instant case.[7] In this case, a defective mental state on the part of the accused is not offered as a defense as such. Rather, the specific defense is self-defense which requires a showing that the accused reasonably believed it was necessary to use deadly force to prevent imminent death or great bodily harm to herself or her children. The expert testimony would have been offered in order to aid the jury in interpreting *807 the surrounding circumstances as they affected the reasonableness of her belief. The factor upon which the expert testimony would be offered was secondary to the defense asserted. Appellant did not seek to show through the expert testimony that the mental and physical mistreatment of her affected her mental state so that she could not be responsible for her actions; rather, the testimony would be offered to show that because she suffered from the syndrome, it was reasonable for her to have remained in the home and, at the pertinent time, to have believed that her life and the lives of her children were in imminent danger. It is precisely because a jury would not understand why appellant would remain in the environment that the expert testimony would have aided them in evaluating the case.
As to appellant's argument that photographs of the deceased were inflammatory and should have been excluded, we find no merit.
REVERSED and REMANDED for a new trial.
McCORD, MILLS and THOMPSON, JJ., concur.
NOTES
[1] Also referenced are Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), and United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).
[2] In both Oregon v. Hass and United States v. Havens, supra, footnote 1, the Court either noted that there was no evidence to suggest that the statements were involuntary or coerced, or clearly assumed the reliability of the statements.
[3] Appellant points to this particular admission as being derived from the illegally obtained and improperly introduced statement. It was her first trial testimony with regard to that admission that was used for impeachment at the second trial. When presented with this prior testimony at the second trial over objection of defense counsel, Mrs. Hawthorne stated: "No sir, I don't recall that. When I gave my statement, I was very upset." All indications are that the admission of placing a shotgun under her daughter's bed on the night of the shooting did originate in the illegally obtained statement, and the appellee has not attempted to demonstrate the contrary.
[4] The following exchange took place when the testimony was offered at trial:

MR. THOMAS: I think it goes to fear, but we can make the proffer later.
THE COURT: I think it has already been made.
During the hearing on the motion for a new trial, defense counsel again attempted to proffer the testimony:
MR. THOMAS: ... and Judge, finally, I would like to offer again America Hawthorne's testimony, and I would like to put it in the record 
THE COURT: What testimony?
MR. THOMAS: The testimony of the sexual molesting by her father.
THE COURT: I have already ruled that not to be material, and I don't think there is any need to get a proffer in the record at this time... .
[5] Appellee informs us that on remand the trial court determined that Dr. Walker's qualifications to express an opinion on the battered woman syndrome were insufficient and her methodology was not generally accepted.
[6] For example, Jones v. State, 378 So.2d 797 (Fla. 1st DCA 1980).
[7] In Tremain, the expert testimony was offered in support of the entrapment defense. Apparently the defense sought to have a lesser standard of responsibility applied to the accused because of his lack of willpower and dependence. In our view this amounts to evidence of a mental defect itself as a defense.