## UNITED STATES

v.

**Bobby G. BOWLING, Jr., 575 68 9801, Engineman Fireman (E–3), U.S. Navy.**

### NMCM 83 0854.

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 10 Aug. 1982.

Decided 29 July 1983.

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

CDR G. Sid Smith, JAGC, USN, Appellate Defense Counsel.

LT William V. Cerbone Jr., JAGC, USNR, Appellate Government Counsel.

Before EOFF, Chief Judge, and GORMLEY and MIELCZARSKI, JJ.

GORMLEY, Judge:

Contrary to his pleas before a special court-martial composed of military judge alone, appellant was found guilty of the possession, sale, and transfer of 7.54 grams of marijuana in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892. Appellant's sentence included confinement at hard labor for three months, forfeiture of $365.00 pay per month for

three months, reduction to the lowest enlisted pay grade (E–1), and a bad conduct discharge. Appellant posits two assignments of error before this Court, but only the first warrants discussion. We find no error prejudicial to the appellant and affirm.

## I

GOVERNMENT COUNSEL WAS PERMITTED, OVER DEFENSE OBJECTION, TO QUERY APPELLANT AS TO PRIOR ACTS OF UNCHARGED MISCONDUCT NOT RELATING TO TRUTHFULNESS, IN VIOLATION OF MIL.R.EVID. 608.

Appellant complains specifically that prejudicial error occurred when the trial counsel was allowed to question him about his prior nonjudicial punishment for possession and use of marijuana in these words:

Q: Have you learned your lesson about marijuana?

A: Sir?

Q: It's before this court that you were on restriction during this period of time for possession and use of marijuana, is that correct?

The trial counsel subsequently questioned appellant about Prosecution Exhibit 2 for identification which was the record of a nonjudicial punishment of appellant for use and possession of marijuana. Appellant asserts that this information was not before the court since Prosecution Exhibit 2 for identification, which had been offered by the government to prove appellant was on restriction, was not accepted into evidence on the merits.

Appellant has overlooked, however, his defense counsel's previous cross-examination of the government informant as follows:

Q: You knew Fireman Bowling had smoked marijuana, didn't you?

A: Yes.

Q: In fact, he'd come up positive on a urinalysis, that was the reason he was in restriction, was he not?

A: I believe it was seized in his room.

Q: And that's why he'd lost his Third Class Crow?

A: Yes, Ma'am.

Q: You thought he'd be a pretty easy target, didn't you?

A: No, not really.

■ Although it was clearly improper for the trial counsel to attempt to impeach appellant by asking about his prior nonjudicial punishment, *United States v. Cofield,* 11 M.J. 422 (C.M.A.1981); *United States v. Wilson,* 12 M.J. 652 (A.C.M.R.1981); Mil.R. Evid. 608(b), we are unable to see how this prejudiced appellant when the information was already before the court, albeit in a different form. In determining whether prejudice occurred, we also consider the obvious perceptions of the defense counsel as evinced by her lack of a timely objection. Mil.R.Evid. 103.

■ We believe that the issue raised by appellant is more properly directed towards the trial counsel's introduction, in rebuttal, of extrinsic evidence of appellant's admissions of selling marijuana from his BEQ room. This evidence was offered to contradict appellant's prior assertion during cross-examination that he had never brought any marijuana on board the Naval Amphibious Base:

Q: You used marijuana, but didn't possess it?

A: Yes, sir.

Q: How did you do that?

A: Sir, I didn't bring no marijuana on the base.

DC: Objection, Your Honor. Again, this inquiry is leading into uncharged misconduct. I believe that—

MJ: Overruled.

Q: How did you use it without possessing it?

A: Well, I go down to I.B., Imperial Beach, and I've got friends down there. I don't bring nothing on the base.

Q: I didn't say possess it on board the base. Can you use it without possessing it?

A: No, sir.

Q: So, you did possess it?

A: Yes, sir.

Q: But not at noon on 7 June 1982?

A: No, sir.

Q: 6th, maybe?

A: As I stated before, I never brought marijuana on the Naval Amphibious Base.

In rebuttal, the following testimony was given by an agent from the Naval Investigative Service:

Q: Mr. Hamilton, did you have a conversation with the accused on the 14th of July 1982?

A: Yes, sir.

Q: Did the accused—In the course of that conversation, did the accused discuss sales of marijuana on board NAB?

A: Yes, sir.

Q: What did he tell you?

A: He stated that in the past he had been involved with the trafficking of marijuana on board the base. He indicated that during the time period of approximately April 1982 to approximately a month prior to interview, he had sold marijuana on approximately 16 occasions.

Q: A month prior to the interview, when would that have been?

A: Would have been in June—middle of June 1982.

Q: Did he say what amounts he would sell?

A: One-fourth ounce for $25.00.

Q: Where did most of these transactions occur? Did he tell you that?

A: Yes, sir. In his BEQ room.

Read literally, appellant's denials of ever bringing any marijuana onto the base are not specifically contradicted by his admissions of selling marijuana from his BEQ room. When appellant's broad denials are read in the context of the entire examination, however, it is clear that he was implying that his involvement with marijuana was strictly limited to his off-base, off-duty time with his friends. Taken in that context, appellant's prior denials are clearly contradicted by his admissions of marijuana trafficking on base.

In *United States v. Banker,* 15 M.J. 207 (C.M.A.1983), the Court of Military Appeals addressed a factual situation very closely on point to that in the case *sub judice.* In *Banker* the following colloquy occurred during the defense counsel's cross-examination of the government informant:

Q: Have you used drugs since March when you went to the OSI?

A: No, I have not.

Q: Have you bought any?

A: Just from [the accused].

Q: Have you bought any from anybody else?

A: No.

The defense counsel then asked the informant about three specific incidences of drug involvement with three individuals. The informant denied all three. The military judge refused to allow the defense counsel to introduce extrinsic evidence contradicting the informant's denials, opining that Mil.R.Evid. 608(b)[1] bars the use of extrinsic evidence of misconduct to impeach

---

1. Rule 608. Evidence of Character, Conduct, and Bias of Witness

(b) *Specific instances of conduct.* Specific instances of conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the military judge, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) con-

cerning character of the witness for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified. The giving of testimony, whether by an accused or by another witness, does not operate as a waiver of the privilege against self-incrimination when examined with respect to matters which relate only to credibility.

a witness. The Court of Military Appeals disagreed with the military judge's interpretation of Mil.R.Evid. 608(b). The Court interpreted Rule 608(b) as only barring the introduction of extrinsic evidence of a witness's conduct when introduced to show the witness's *general character* for truthfulness, not when offered, as in *Banker,* to impeach the informant through contradiction. Pointing out that the analogous federal rules allow extrinsic evidence of specific acts of a witness to contradict a collateral assertion of the witness during *direct examination,* the Court opined that even though the proffered testimony would clearly have contradicted the informant's testimony, "we are not convinced that the federal practice is so broad as to allow extrinsic evidence to be used to contradict a witness on a collateral matter asserted on *cross-examination.*" (Citations omitted) (emphasis added) *Banker,* 15 M.J. at 211.

We agree with the Court of Military Appeals' analysis of the complex evidentiary issue in *Banker.* We also agree with their assessment of the general rule of impeachment as applied in the federal courts. The facts in the case *sub judice,* however, require us to go one step further and analyze an exception to that general rule which is recognized in the federal cases. This exception allows the introduction of extrinsic evidence to contradict assertions which are *volunteered* by a witness during cross-examination. We must determine whether that exception should be applied in courts-martial and, if so, whether it is applicable in this case.

Addressing the constitutional question regarding the use of illegally seized evidence against a defendant, the following Supreme Court cases shed some light on the underlying rationales which are relevant to the issue. In *United States v. Walder,* 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the Supreme Court held that it was not error for the government to introduce, in rebuttal, illegally seized heroin to contradict the defendant's collateral assertion during his direct examination that he had never possessed nor handled narcotics. The Supreme Court agreed that an accused must be free

to deny the charge against him without opening the door to the government to bring in illegally seized evidence. "Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Walder,* 347 U.S. at 65, 74 S.Ct. at 356. Prior to their decision in *Walder,* the Court had held that it was error to allow the government to use an illegally seized can of cocaine to contradict an assertion by the defendant on cross-examination, over objection, that he had never seen the illegally seized evidence. *United States v. Agnello,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). In *Walder* the Court distinguished *Agnello* by pointing out that the prosecutor in that case had "smuggled in" his impeaching opportunity on cross-examination. *Walder,* 347 U.S. at 66, 74 S.Ct. at 356.

More recently, the Supreme Court expressly rejected a flat rule which would allow the use of illegally seized or otherwise inadmissible evidence to impeach only statements made during direct examination. The Court, explaining that such a rule misapprehends the underlying rationale of *Walder,* stated: "There is no gainsaying that arriving at the truth is a fundamental goal of our legal system (citation omitted). We have repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences." *United States v. Havens,* 446 U.S. 620, 626, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980) (four justices dissenting). "In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." *Id.* at 627, 100 S.Ct. at 1916.

The Second Circuit Court of Appeals explained the basis for the rule that where a defendant falsely states a specific fact on

direct, the government may prove, through cross or by extrinsic evidence, that he lied to that fact: "The rationale behind this rule is not difficult to perceive, for even if the issue injected is irrelevant or collateral, a defendant should not be allowed to profit by a gratuitously offered misstatement." *United States v. Beno,* 324 F.2d 582 (2d Cir.1963), *cert. denied* 379 U.S. 880, 85 S.Ct. 147, 13 L.Ed.2d 67 (1964).

The Third Circuit Court of Appeals disapproved of the use of cross-examination to lure a witness into opening the door to otherwise inadmissible uncharged misconduct, but recognized that in some situations, uncharged misconduct could be properly admitted to contradict a witness:

> Nothing in the *Walder* decision suggests that it authorizes the government to elicit denials on collateral issues during cross-examination to lay a trap which will be sprung in rebuttal (citation omitted). Indeed the *Walder* Court made extensive approving references to *Agnello v. United States,* 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), where such tactics were expressly disapproved.... While *Walder* and *Agnello* in terms apply only to evidence barred by the exclusionary rule, we think that an analogous principle should apply to evidence that would otherwise be inadmissible under Rule 404.... If we were to construe Rule 611(b) as permitting cross-examination with respect to other crimes solely for the purpose of creating credibility issues we would present a defendant who takes the stand with the Hobson's choice of admitting prior uncharged acts of misconduct or of opening the door to presentation of evidence of such acts in rebuttal. The net effect of such a rule would be to permit the introduction of specific acts of prior misconduct whenever a defendant took the stand. That result could not be squared with the provisions of Rule 404(b).... For these reasons federal courts which have considered the question have limited use of otherwise inadmissible evidence for impeachment by contradiction "to contradiction of specific false statements made by defendants on direct examination," (citations omitted), or to statements volunteered by the defendant on cross-examination. *United States v. Wright,* 542 F.2d 975, 981 (7th Cir.1976).

*United States v. Pantone,* 609 F.2d 675, 683 (3d Cir.1979).

Chief Judge Weinstein, United States District Court, Eastern District of New York, advocates the use of a flexible rule in determining the admissibility of extrinsic evidence to contradict collateral assertions by a witness: "An analysis of the probative strength of the evidence and an assessment of the dangers attendant on its admission rather than use of the unexplained label would seem helpful in focusing on the primary truth-seeking function of the law." 3 *Weinstein's Evidence* § 607[5] at 607–66 (1981). The application and logic of this flexible approach is set forth in *United States v. Bell,* 506 F.2d 207 (D.C.Cir.1974). On direct examination, Bell, charged with several narcotics offenses, denied ever possessing any of the narcotics which had been thrown from the pier where he had been arrested with two others while attempting a drug transfer. He testified that he had only gone to the pier to fish. On cross-examination, the following exchange occurred:

Q: Now, what happened when you were talking to Mr. Cardwell and Mr. Davis? What were they doing?

A: Fishing and clowning around.

Q: Were they selling any narcotics down there?

A: I have never seen any of them.

Q: Have you ever seen narcotics before?

A: Not, I would say, actually close right down—right to look at it. I have seen it on television and I have heard it described.

Q: And, this trial is the first time where you have got a chance to see real live narcotics, isn't it?

A: I haven't seen it in the trial. I have just seen it from a distance. I couldn't verify it was narcotics. That is only what they told me.

*Bell,* 506 F.2d at 212 note 20. In rebuttal the government called a police officer to testify to a narcotics sale which Bell had made to an informant a few days prior to his arrest. The Court found that Bell's initial denial was intended to mean that he had never seen any real narcotics. This, the Court stated, was indistinguishable from *Walder* where the defendant "[o]f his own accord ... went beyond a mere denial of complicity in the crimes of which he was charged and made the sweeping claim that he had never dealt in or possessed any narcotics." *Bell,* 506 F.2d at 214 (quoting from *Walder,* 347 U.S. at 65, 74 S.Ct. at 356). "We have been advertent to our obligation to apply *Walder* within its prescribed limits, which encompass the use even of tainted evidence to impeach exhorbitant testimonial claims volunteered by an accused on trial." *Bell,* 506 F.2d at 214. The Court found that in light of Bell's self-representation as one who had never before seen narcotics, the evidence showing a prior involvement with narcotics "obviously bore a high degree of relevance to his credibility in disclaiming any acquaintance with narcotics. And since Bell's defense to the charges on trial was largely self asserted, the jury's need to accurately assess Bell's credibility was vital." *Bell,* 506 F.2d at 215 (footnote omitted). This evidence went no further than necessary to rebut Bell's claims and "promised more than enough of a contribution to the cause of truth to outweigh the attendant risks." *Id.* (footnote omitted).

■ We find the logic and reasoning from the aforementioned cases and authorities persuasive for adopting the exception to the rule of impeachment which allows the use of extrinsic evidence to contradict an assertion by a witness which is *volunteered* during cross-examination. Agreeing with the strong denunciation by the Supreme Court of the practice of using cross-examination to trap a witness into opening the door for otherwise inadmissible rebuttal, yet recognizing the danger to the truth-seeking function of our system that is presented by a witness's exhorbitant perjurious claims to bolster his own credibility or

case, we hold that the following procedure should be followed when extrinsic evidence of uncharged misconduct is offered solely to contradict a collateral assertion made by a witness during cross-examination: the military judge should first determine whether the assertion was volunteered by the witness or elicited by the cross-examiner; if the assertion was volunteered, the judge then should determine whether the probative value of the proffered extrinsic evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or the possibility of misleading the members, or by considerations of undue delay, waste of time, or needless cumulation of evidence. Mil.R.Evid. 403. If the probative value of the proffered evidence is not substantially outweighed by these factors, then the military judge may admit the extrinsic evidence.

■ Obviously when the judge is the trier of fact, the potential for prejudice and confusion of the issues will be much less than when the court is composed of members. However, even in a judge alone trial, the judge may determine that the probative value of the proffered evidence does not justify the time that will be consumed in acquiring and presenting that evidence. Ultimately, the trial judge should be given broad discretion in making this determination since he is trained to disregard evidence which he excludes and to attribute to admitted evidence its proper weight and relevance. *United States v. Montgomery,* 20 U.S.C.M.A. 35, 42 C.M.R. 227 (1970).

■ Although the extrinsic evidence at issue in this case is arguably also a prior admission or prior inconsistent statement of appellant, in applying the aforementioned rule we have treated it as we would any extrinsic evidence of misconduct. After closely reviewing the record, we find that appellant's sweeping denial of ever bringing any drugs on board the base was volunteered by him during cross-examination; we are unable to find that the military judge abused his discretion in admitting the extrinsic evidence of appellant's prior mis-

conduct to contradict that sweeping denial and its implications. Accordingly the findings and sentence, as approved on review below, are affirmed.

Chief Judge EOFF and Judge MIELC-ZARSKI concur.