THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRANK WILLIAMS, Defendant-Appellant.
First District (1st Division)   No. 1—88—1168

Opinion filed November 5, 1990.

Randolph N. Stone, Public Defender, of Chicago (Mary C. Arundel and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, David R. Butzen, and Kathleen L. Panozzo, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Frank Williams was convicted of armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2) and sentenced to eight years' imprisonment. Williams appeals his conviction. For the reasons below, we reverse and remand.

On June 8, 1987, at approximately 5 a.m., the Hertz Rent-A-Car agency at O'Hare Airport was robbed. A man walked into Hertz and asked Hertz employee Paul Jackson for a job application. Jackson called the manager, Ed Burchert, who told the man to come back the next Tuesday for an application. The man left.

The man returned immediately, showed Jackson a pistol, and demanded money. Jackson gave $178 from a cash drawer to the man, who then demanded that Jackson open the safe. Jackson and the man went into the back room to get the safe key from Burchert. Burchert as-

sumed the man had not understood the instructions about the job application and repeated to him to return Tuesday.

Before Jackson could ask for the safe key, a customer entered the storefront. Jackson and the robber left the back room. The robber told Jackson to take care of the customer, and as Jackson did so, the robber left the building. Jackson called the police and told them he had been robbed with a silver gun.

On June 10, 1987, Chicago police officer Gaal stopped an Avis rental car in which Frank Williams, an Avis employee at O'Hare, was a passenger. Finding that neither Williams nor the driver had proper rental papers for the car, Gaal arrested them both. Gaal found a clear plastic bag with six .38 caliber cartridges on the front passenger seat with Williams. But, Gaal had no probable cause to stop and search, and a motion to quash the arrest and suppress the evidence was granted.

On June 19, Jackson identified Williams as the Hertz robber, identifying his picture and picking him out of a lineup. Williams was charged with the armed robbery of Hertz and given a jury trial.

At trial, Jackson testified to the details of the robbery, identifying Williams as the robber. Jackson testified that Williams had used a .38 caliber revolver, a detail of which he was sure because of his experience with guns. Jackson acknowledged, however, that he had told police only that the robber had used a silver gun.

Ed Burchert testified that he had spoken twice to the man who had asked for a job application and both times had looked directly at the man. Burchert had been unable, however, to identify Williams as that man in a lineup.

Detective Patrick Brosdan was a Chicago police officer who moonlighted as a security officer for the O'Hare Avis rental agency, located near the Hertz agency. Brosdan testified that on June 8, he saw an Avis employee, whom he later identified as Williams, drive into the Avis employee parking lot at about 1 a.m. and leave at about 5:20 a.m. On cross-examination, Brosdan admitted that at the time he neither identified the driver as Williams, nor made any notes concerning the vehicle or driver, but had, prior to testifying, reviewed prepared police reports concerning the investigation of Williams.

Iola McDaniel and Maxine Over, who lived with Williams, testified that on June 7, Williams came home at 10:30 p.m., spoke to them, then went to bed. Neither saw Williams leave the house after 10:30.

Williams testified that on June 7, he worked at Avis from 3 p.m. to 9 p.m., went home at about 10:30, and shortly after went to bed. Responding also to a series of questions intended to elicit biographical details, Williams testified that he had served four years in the army

and two years in the National Guard. The record shows that the questions about Williams' military service concerned only years served and the locations of service. No questions were asked concerning Williams' knowledge or experience with firearms.

On cross-examination, the prosecutor asked Williams about his whereabouts on June 7 and 8 and a conversation with Assistant State's Attorney Ellen Mandeltort. The prosecutor then explored Williams' military career in the following colloquy:

"Q. Now you have testified, sir, you were in the military?

A. Yes.

Q. Did you ever see a .38 caliber gun?

A. No.

Q. In the military?

A. Never, never in the military. They have .45s.

Q. All right, so in the course of your four years in the United States military, you never saw a .38 caliber weapon?

A. Never seen a .38.

Q. Did you ever see a .38 caliber bullet?

A. No.

DEFENSE COUNSEL: Objection.

THE COURT: All right, I am going to overrule that."

After the objection was overruled, the prosecutor asked no more questions about Williams' military career, or his knowledge of any weapons or bullets, but rather proceeded to ask about Williams' participation in the lineup of June 19.

During a conference on jury instructions, defense counsel again raised the objection to the questions whether Williams had ever seen a .38 caliber weapon or bullet. The trial court's notes of the colloquy stated, "I was in the military. Ever see a .38 caliber? No. Never seen a .38 caliber bullet? No." Relying on its notes, the trial court found that the question whether Williams had ever seen a .38 caliber bullet was sufficiently general to encompass more than Williams' military career. Accordingly, the trial court allowed Officer Gaal to testify, for impeachment purposes only, to Williams' arrest while possessing .38 caliber cartridges.

In rebuttal, Assistant State's Attorney Mandeltort testified that, in a conversation with Williams, he had told her that he had been at O'Hare on June 7 and that it was his day off. Mandeltort also testified that Williams told her that he had returned to O'Hare at about 1 a.m. in an Avis rental car.

On cross-examination, Ms. Mandeltort admitted she had made no notes of her conversation with Williams, nor had any statement by Wil-

liams been produced from that conversation, and that she was testifying from memory to the conversation that had taken place almost two years before. Ms. Mandeltort also admitted that prior to testifying she had seen a prepared police report on Williams that referred to a statement allegedly made by Williams.

The jury returned a verdict of guilty. Williams was convicted and sentenced to eight years' imprisonment. Williams appeals.

Williams argues that the trial court erroneously allowed impeachment of his assertion that he had not seen a .38 caliber bullet with the suppressed evidence that he had been arrested with .38 caliber bullets in his possession. Williams contends that use of the suppressed evidence was improper because the question about .38 caliber bullets was asked in the context of his military service. The State counters that the trial court correctly found that the question was asked in a general context and not limited to the period of Williams' service. Regardless of the context of the State's questions, admitting the suppressed evidence to impeach Williams was error.

■ The State may impeach a defendant with suppressed evidence (*Agnello v. United States* (1925), 269 U.S. 20, 70 L. Ed. 145, 46 S. Ct. 4; *United States v. Havens* (1980), 446 U.S. 620, 64 L. Ed. 2d 559, 100 S. Ct. 1912, *reh'g denied* (1980), 448 U.S. 911, 65 L. Ed. 2d 1172, 101 S. Ct. 25; *People v. James* (1988), 123 Ill. 2d 523, 528 N.E.2d 723, *rev'd on other grounds* (1990), 493 U.S. 307, 107 L. Ed. 2d 676, 110 S. Ct. 648); a defendant's constitutional shield against having illegally seized evidence used against him may not be "perverted into a license to use perjury by way of a defense, free from the risk of confrontation." (*Havens*, 446 U.S. at 626, 64 L. Ed. 2d at 565, 100 S. Ct. at 1916.) But the State may not impeach a defendant merely as a subterfuge to place otherwise inadmissible evidence before the jury.

In *United States v. Webster* (7th Cir. 1984), 734 F.2d 1191, the prosecution called a witness to testify whose testimony tended to exculpate the defendant. The prosecution then impeached the witness with inculpatory prior inconsistent statements that were otherwise inadmissible hearsay. The Seventh Circuit declared that for the State to call a witness it knew would give no useful testimony, to introduce inadmissible evidence as impeachment in the hope that the jury would either miss or ignore the distinction between impeachment and substantive evidence, was an abuse of evidentiary rules and accordingly ruled that impeachment may not be permitted where employed "as a mere subterfuge to get before the jury evidence not otherwise admissible." *Webster*, 734 F.2d at 1192.

The use of inadmissible evidence in *Webster*, however, was justified

by a finding of good faith by the prosecutor, who had asked the trial court to question the witness outside the presence of the jury. Defense counsel objected, and the request was denied. The Seventh Circuit found that the request for *voir dire* indicated that the prosecution could not have known that the witness would not give useful testimony. *Webster*, 734 F.2d at 1192-93.

■ Here, in a situation analogous to *Webster*, the State asked questions that could have produced no useful information. Williams' military record was totally unconnected to the crime with which he was charged; the facts did not even suggest that knowledge or experience derived from military service had been necessary or employed in the commission of the robbery. The State argues that because the robbery was committed with a .38 revolver, it was "only natural" to inquire as to Williams' knowledge and experience with such weapons and ammunition. But again, the facts show nothing to indicate that any general knowledge or experience with weapons, much less weapons of a specific caliber, had been necessary or used in the commission of the crime. The State's argument, moreover, defies the commonsense understanding that all one need know to use a gun is which end to point and the location of the trigger.

We also note that the State's assertion that the robbery was committed with a .38 revolver is based on Paul Jackson's trial testimony, which was countered by his admission that he had originally told police that the robber had used a "silver gun." Jackson testified that he knew from his military experience that the weapon used was of .38 caliber. The State's argument, therefore, that Williams' knowledge and experience with firearms made it more likely that he committed the crime, applies equally to Jackson, who was accused of nothing.

Because the information elicited by the State's questions was so far removed from the crime charged, the State could not reasonably have expected its questions to produce useful information. Thus, the State's conduct cannot be rescued by a finding of good faith; the questions were a deliberate and virtually transparent deliberate maneuver to sidestep Williams' constitutional protections and place before the jury illegally obtained, and otherwise inadmissible, evidence.

■■ ■ Even were the context of the State's cross-examination questions dispositive, the record shows that admission of suppressed evidence for impeachment was error. The State may impeach either the defendant's statements during direct examination, or answers to questions on cross-examination where the questions are plainly within the scope of the direct examination. (*Havens*, 446 U.S. at 627, 64 L. Ed. 2d at 566, 100 S. Ct. at 1916.) But where the cross-examination has too

tenuous a connection to any subject opened on direct examination, impeachment with tainted evidence will not be permitted. *Havens*, 446 U.S. at 625, 64 L. Ed. 2d at 565, 100 S. Ct. at 1916. See, *e.g.*, *Agnello v. United States* (1925), 269 U.S. 20, 70 L. Ed. 145, 46 S. Ct. 4.

Here, the prosecution asked the following questions:

"Q. All right, so in the course of your four years in the United States military, you never saw a .38 caliber weapon?

A. Never seen a .38.

Q. Did you ever see a .38 caliber bullet?

A. No."

The bullet question indicates no context beyond that of the questions immediately preceding it. The context, therefore, is, at best, ambiguous, but the most reasonable reading of the record shows that the question was asked within the context of Williams' military service.

Having determined that Williams never saw a .38 caliber *weapon* in four years of military service, the prosecutor next asked, "Did you ever see a .38 caliber *bullet?*" The phrasing of the question, "did you ever see," indicates a specific frame of reference, and not the general life experience connoted in the phrasing, "have you ever seen," indicated by the trial court's notes. Given the preceding questions, the distinction between weapons and bullets, and the phrasing of the bullet question, the most reasonable interpretation of the record is that Williams answered the bullet question with the understanding that it was within the context of his military experience. Clearly, Williams' testimony that he never saw a .38 caliber bullet, while he served in the military, could not properly be impeached by his possession of .38 bullets at the time of his arrest years later. The trial court's ruling to allow impeachment, based on a misinterpretation of the record, was error.

■ But assuming the trial court had not erred in its interpretation of the record, the use of suppressed evidence to impeach Williams remains improper because the State's questions were beyond the scope of the direct examination. Although the trial court has wide discretion in allowing cross-examination, allowing questions beyond the scope of direct examination constitutes an abuse of that discretion. Here, no direct examination questions were directed towards Williams' knowledge of weapons of any kind, either in the context of his military experience or generally. Because the cross-examination questions were beyond the scope of the direct examination, impeachment with suppressed evidence was improper. *United States v. Havens* (1980), 446 U.S. 620, 627, 64 L. Ed. 2d 559, 566, 100 S. Ct. 1912, 1916.

■ The State further argues that any error was harmless because the evidence of guilt was overwhelming. That argument, however, is

not supported by the record.

The victims, Jackson and Burchert, saw the robber in good light, and both talked to him before he revealed his intent to rob the Hertz agency. Only Jackson, however, was able to identify Williams. Jackson also testified in court that the robber had used a .38 caliber handgun, but told police just after the robbery only that the robber had used a silver gun.

Officer Brosdan testified that Williams had entered and left the Avis rental agency on the morning of the robbery, but Brosdan had no notes to refresh his recollection and admitted reading prepared police reports before testifying. Assistant States' Attorney Mandeltort testified that, in a conversation with Williams, he had admitted being at the Avis lot on the morning of the Hertz robbery. But, like Brosdan, Mandeltort had no notes to refresh her recollection, and she also admitted reading prepared police reports concerning the investigation of Williams before testifying.

Williams testified that he was at home when the robbery occurred. Iola McDaniel and Maxine Over corroborated Williams, but both women lived with Williams. Finally, the State presented no physical evidence of any kind to connect Williams to the robbery.

The facts showed that determination of guilt depended largely on the jury's assessment of the witnesses' credibility. The evidence, although sufficient to prove guilt, was not so overwhelming that no jury could have found reasonable doubt. The improper admission of inadmissible evidence could easily have prejudiced the jury by introducing an otherwise absent physical link between Williams and the crime, too tempting for the jury to ignore as substantive evidence. Thus, the clear abridgement of Williams' constitutional right to be shielded from the use of illegally obtained evidence was substantially prejudicial.

Finally, because we reverse, we need not address Williams' argument that the State's attempt to argue the impeachment evidence as substantive evidence was reversible error. The trial court's ruling to permit impeachment with previously suppressed evidence was erroneous and, given the closely balanced evidence, substantially prejudicial. Accordingly, we reverse and remand for a new trial.

Reversed and remanded for a new trial.

CAMPBELL and MANNING, JJ., concur.