*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

FRANK JAMES NEAL,

        Defendant-Appellant.

UNPUBLISHED
October 22, 2020

No. 345748
Genesee Circuit Court
LC No. 16-039732-FC

## ON RECONSIDERATION

Before: CAVANAGH, P.J., and BECKERING and GLEICHER, JJ.

CAVANAGH P.J. (*dissenting*).

On reconsideration, I conclude that prosecutorial misconduct entitles defendant to a new trial. And contrary to defendant's argument for reconsideration, a new trial is necessary because the evidence was sufficient for a reasonable jury to find defendant guilty on the four charges of AWIM. But in light of the conclusion that defendant is entitled to a new trial, defendant's alternative claim that the great weight of the evidence weighed against the jury verdict is rendered moot.

The majority states that defendant requested this Court to reconsider our prior decision with regard to his *successful* claims of prosecutorial misconduct. I do not agree.[1] In any case, the prosecutor's misconduct denied defendant a fair and impartial trial. See *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007).

First, the prosecutor improperly cross-examined defendant regarding his prior arrests—arrests not convictions. The majority holds that defendant's brief testimony that he lied to police initially about which gun he shot because he had "never been in trouble before," allowed the prosecutor to then ask defendant numerous inflammatory questions on cross-examination, including: "You've been arrested on at least three occasions, true?" And to follow up, asking,

---

[1] In fact, even the prosecution did not challenge this decision or our previous opinion.

"You've been arrested at least twice for assaultive offenses, right?" The majority concludes that this cross-examination constituted proper impeachment because "it is unimaginable that inquiry about arrests would be forbidden to establish that a witness is generally not credible." Really? Prior arrests are critically different than prior convictions.[2] As the United States Supreme Court explained in *Michelson v United States*, 335 US 469, 482; 69 S Ct 213; 93 L Ed 168 (1948):

> Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty. Only a conviction, therefore, may be inquired about to undermine the trustworthiness of a witness.[3]

The majority claims that this cross-examination was proper as constituting "impeachment by contradiction." But as the case relied on by the majority, *People v Wilder*, 502 Mich 57; 917 NW2d 276 (2018), states: "Impeachment of this kind usually occurs when a prosecutor seeks to cross-examine a defendant about prior *convictions* in order to impeach a defendant's blanket denial on direct examination of ever engaging in conduct similar to the charged conduct." *Id*. at 64 (Emphasis added). The prosecutor in this case did not cross-exam defendant about prior *convictions*. And as the *Wilder* Court further explained:

> [I]t is beyond dispute—or should be—that questions designed to elicit other-acts evidence, absent a proper purpose, violate MRE 404(b) and are objectionable for that reason. See 1 McCormick, Evidence (7th ed), § 190, p 1030 n 5 ("The [404(b)] rule of exclusion encompasses **questions** which, though answered negatively, insinuate that the accused committed other crimes."). [*Id*. at 68 n 16 (Emphasis added).]

As the *Michelson* Supreme Court noted, prior arrests do not mean that a person has, in fact, "been in trouble before." Innocent people are arrested all the time. Thus, there was no "contradiction." And there was no "proper purpose" for the prosecutor's questions. That defendant had been arrested in the past did not bear on his credibility; it is irrelevant in that regard.[4] See *Michelson*,

---

[2] The majority's reliance on *People v Layher*, 464 Mich 756; 631 NW2d 281 (2001), is misplaced. In that case, the defendant was on trial for criminal sexual conduct against his minor niece and the lead defense witness was his investigator who had been tried and acquitted of similar charges— facts which gave rise to a potential for biased testimony in favor of the defendant as wrongfully accused. *Id*. 760-765. The *Layher* case addressed witness bias only, and even then cautioned that the evidentiary safeguards set forth in the Michigan Rules of Evidence, particularly MRE 403, must be carefully considered. *Id*. at 768-769.

[3] The majority's assertion that this obvious and inviolable legal principle—that one is innocent until proven guilty—"loses its force when a defendant opens the door to impeachment as to a fact that he has injected into the case" is quite perplexing and leaves me speechless.

[4] The concurring Judge opines that defendant "opened the door" to the extensive searching inquiry that followed on cross-examination. I disagree but even if defendant cracked the door open, the prosecutor merely had to ask what defendant meant when he said he had never been in trouble before and should not have immediately raised the inflammatory fact of his *three prior arrests*. In

335 US at 482. But even if it did bear on his credibility, clearly his prior *arrests* for alleged domestic violence against his wife—a highly inflammatory offense—are not more probative than prejudicial on the issue of credibility. That is, the danger of unfair prejudice substantially outweighed any probative value, especially considering that defendant's reference to not being in trouble before was very brief and buried in his other testimony. See MRE 403. Therefore, I conclude that the prosecutor's misconduct constituted plain error which affected defendant's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Second, the prosecutor's repeated mischaracterizations of defendant's second interview with police during his cross-examination—that he only "changed his story" after being confronted with the results of the DNA testing—constituted misconduct. The questioning included:

> *Q*. So then you talked to the police a second time, true?
>
> *A*. Yes.
>
> *Q*. That's when you talked to Special Agent Dwyre?
>
> *A*. Yes.
>
> *Q*. And Special Agent Dwyre then confronted you with the fact that your DNA had been found on the rifle, right?
>
> *A*. Yes. I been knew [sic] that my DNA was on the rifle.
>
> *Q*. You never changed your story and admitted to shooting the rifle until you were confronted with the fact that your DNA was on the rifle, right?
>
> *A*. No, ma'am. I never talked to - - when I got my paperwork to saying [sic] that the DNA was on there, I never talked to a detective or a police officer ever since then until the time that I talked to Dwight [sic] [Dwyer], and that was the only chance that I had to tell him that . . . .
>
> *Q*. And you didn't go in there and flat out tell him all that when he asked, he had to confront you with your DNA being on the rifle before you then changed your story true?
>
> *A*. No. No, because my lawyer been on top, he's been telling me everything that was going on with the case from day one when I hired him.
>
> *Q*. But you did not offer that information to Special Agent Dwyre?

---

other words, any "false impression" left with the jury by defendant's brief purported "character" testimony did not invite the trampling down of the door by the prosecutor.

After discussing other issues, the prosecutor again pressed defendant about the DNA evidence and the interview with Special Agent Dwyre:

> *A*. I told Dwyre, you know, that I did shoot the rifle. That was way before this—this trial even came upon, so.
>
> *Q*. After your DNA was found on it though, right?
>
> *A*. No, it was probably before the DNA because he came back and got another sample of DNA from me that the first one, don't even know what happened to it. And when I talked to Dwyre, that was before the DNA sample, ma'am.
>
> *Q*. But you've already admitted that Dwyre confronted you with the fact that your DNA was found on the gun, so how does that make sense?
>
> *A*. I mean, he talked to me and . . . he said he believed what I'm saying . . . . I didn't deny that I wasn't [sic] shooting the rifle. I did tell him that I didn't shoot nobody because I never did shoot nobody nor shot in no one's direction.

During the lunch break, defense counsel reviewed defendant's interview with Special Agent Dwyre, and realized that Dwyre never mentioned DNA evidence during the interview. The prosecutor conceded that DNA was not mentioned in the interview and apologized, claiming it was an "honest mistake."

The majority concludes that "mistakes happen." And "this mistake was hardly important." I disagree. This cross-examination occurred after the prosecution had already thoroughly exploited the improper issue of defendant's prior arrests for domestic violence and served to powerfully remind the jury that defendant was a "liar." First, he lied to the jury about never being in trouble before—until confronted with his prior arrest record. Just like he lied to the police about which gun he shot—until he was confronted, purportedly, with DNA evidence. This misconduct tends to demonstrate that the prosecutor's primary objective was to get a conviction—whether innocent or guilty. See *Dobek*, 274 Mich App at 63. And the belated jury instruction given the next day, after other witness testimony and closing statements, was not curative. It was too late to thwart the momentum gained by the prosecutor in convincing the jury that defendant was a violent man or wife beater and a liar. See, e.g., *People v Musser*, 494 Mich 337, 364-365; 835 NW2d 319 (2013).

Third, the prosecutor's mischaracterization of prior witness testimony—also during the cross-examination of defendant—concerning the possibility of a third shooter constituted misconduct. The questioning included:

> *Q*. I'm talking about in court, the evidence that actually exists before this jury. Not one person has testified that the victims had any sort of gun or were shooting at you including your own testimony, right?
>
> *A*. Correct.

*Q*. So, how are they shooting back at you when you've already admitted they didn't have guns?

*A*. I didn't say they was shooting back at me . . . . I'm hearing other shots and there are already statements that people did see people running away and a person running with a gun shooting . . . .

*Q*. And no one has said that before this jury true?

*A*. True, but—

*Q*. Okay. Then that's all we need about that, okay? No one has said that before this jury so that evidence doesn't exist in this trial true?

*A*. True.

The majority concludes that there were no "plainly erroneous mischaracterizations." But even the prosecutor admits on appeal that "there is an error" in this regard because Donald Houghtaling testified that that "he saw someone running up the street with a gun." In any case, this cross-examination of defendant—while not the worst misconduct—occurred after the prosecutor had already exploited the improper issue of defendant's prior arrests and had already falsely accused defendant of "changing his story" during a police interview. Consistent with the prosecutor's theme, the jury was once again powerfully reminded—using improper, false, and misleading accusations—that defendant was a "liar." This strategy was likely successful as evidenced by the fact that even the majority opinion of this Court refers to defendant as a "liar," albeit in a more homogenized way by stating that he was "willing to lie under oath."

In isolation one of these instances of prosecutorial misconduct may not have been sufficient to support a conclusion that defendant was denied a fair and impair trial. But the cumulative effect of these three instances of prosecutorial misconduct constituted sufficient prejudice to warrant reversal. See *People v LeBlanc*, 465 Mich 575, 591; 640 NW2d 246 (2002). Defendant's defense rested entirely on whether the jury believed that he fired his gun in the air, i.e., his credibility. While the prosecutor had every right to use legitimate means to discredit defendant's testimony, the prosecutor could not use his prior arrests and manufacture or mischaracterize facts—time after time after time during his cross-examination—in an effort to convince the jury that defendant is a violent liar who committed the charged crimes. Maybe he is and maybe he did, but the jury has to reach its decision through properly admitted evidence. While the government is entitled to a "proper" cross-examination when a defendant takes the stand, as the case cited by the majority states—*United States v Havens*, 446 US 620, 626-627; 100 S Ct 1912; 64 L Ed 2d 559 (1980)—a "proper" cross-examination did not occur in this case.

Accordingly, defendant's convictions and sentences should be vacated, and this matter should be remanded for a new trial.

/s/ Mark J. Cavanagh